IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| JENNY L. ULESKI, | ) | CASE NO. 1:13 CV 2023 |
| | ) | |
| Plaintiff, | ) | |
| | ) | MAGISTRATE JUDGE |
| v. | ) | WILLIAM H. BAUGHMAN, JR. |
| | ) | |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY, | ) | **MEMORANDUM OPINION AND** |
| | ) | **ORDER** |
| Defendant. | ) | |

## Introduction

**A.    Nature of the case and proceedings**

Before me[1] is an action by Jenny L. Uleski under 42 U.S.C. § 405(g) for judicial review of the final decision of the Commissioner of Social Security denying her applications for disability insurance benefits and supplemental security income.[2] The Commissioner has answered[3] and filed the transcript of the administrative record.[4] Under my initial[5] and

---

[1] ECF # 16. The parties have consented to my exercise of jurisdiction.

[2] ECF # 1.

[3] ECF # 13.

[4] ECF # 14.

[5] ECF # 5.

procedural[6] orders, the parties have briefed their positions[7] and filed supplemental charts[8] and the fact sheet.[9] They have participated in a telephonic oral argument.[10]

**B.      Background facts and decision of the Administrative Law Judge ("ALJ")**

Uleski, who was 32 years old at the time of the hearing,[11] has a high school education[12] and past relevant work experience as an ad inserter for a newspaper and as a food preparation worker.[13] She lives with her mother and has a driver's license, although she does not drive.[14]

The ALJ, whose decision became the final decision of the Commissioner, found that Uleski had the following severe impairments: dysthymic disorder, bi-polar disorder, and borderline intellectual functioning.[15]

---

[6] ECF # 15.

[7] ECF # 23 (Commissioner's brief); ECF # 21 (Uleski's brief).

[8] ECF # 23-1 (Commissioner's charts); ECF # 21-1 (Uleski's charts).

[9] ECF # 22 (Uleski's fact sheet).

[10] ECF # 25.

[11] Transcript ("Tr.") at 25.

[12] *Id.*

[13] *Id.* at 295.

[14] *Id.* at 22-23.

[15] *Id.* at 19.

After concluding that the relevant impairments did not meet or equal a listing, including particular attention to listings 12.04 and 12.05,[16] the ALJ then made the following finding regarding Uleski's residual functional capacity ("RFC"):

> After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: the claimant is limited to simple, routine, and repetitive tasks in an environment free of fast paced production requirements and that requires only simple workplace decisions with few, if any, workplace changes. Additionally, the claimant is limited to only occasional interaction with the public and with co-workers.[17]

The ALJ decided that this residual functional capacity precluded Uleski from performing any past relevant work.[18]

Based on an answer to a hypothetical question posed to the vocational expert at the hearing setting forth the residual functional capacity finding quoted above, the ALJ then determined that a significant number of jobs existed locally and nationally that Uleski could perform.[19] The ALJ, therefore, found Uleski not under a disability.[20]

---

[16] *Id.* at 20-22.

[17] *Id.* at 22.

[18] *Id.* at 25.

[19] *Id.* at 26.

[20] *Id.*

**C.    Issue on judicial review and decision**

Uleski asks for reversal of the Commissioner's decision on the ground that it does not have the support of substantial evidence in the administrative record. Specifically, Uleski's challenge presents the following issue for judicial review:

> The ALJ found that Uleski's mental impairments did not meet or equal the listing for mental retardation in § 12.05C. Although Uleski had two IQ scores that numerically fall within the listing, a psychologist who administered one of the tests questioned its validity, and several psychologists opined that Uleski manifested borderline intellectual functioning rather than mental retardation. Does substantial evidence support the ALJ's finding?

For the reasons that follow, I will conclude that the ALJ's finding of no disability is supported by substantial evidence and, therefore, must be affirmed.

## Analysis

**A.    Standard of review – substantial evidence**

The Sixth Circuit in *Buxton v. Halter* reemphasized the standard of review applicable to decisions of the ALJs in disability cases:

> Congress has provided for federal court review of Social Security administrative decisions. 42 U.S.C. § 405(g). However, the scope of review is limited under 42 U.S.C. § 405(g): "The findings of the Secretary as to any fact, if supported by substantial evidence, shall be conclusive...." In other words, on review of the Commissioner's decision that claimant is not totally disabled within the meaning of the Social Security Act, the only issue reviewable by this court is whether the decision is supported by substantial evidence. Substantial evidence is " 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' "

> The findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion. This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference.[21]

Viewed in the context of a jury trial, all that is necessary to affirm is that reasonable minds could reach different conclusions on the evidence. If such is the case, the Commissioner survives "a directed verdict" and wins.[22] The court may not disturb the Commissioner's findings, even if the preponderance of the evidence favors the claimant.[23]

I will review the findings of the ALJ at issue here consistent with that deferential standard.

**B.  Application of standard – substantial evidence supports the decision of the Commissioner, which will therefore be affirmed**

As noted, this case presents a single issue for decision – does substantial evidence support the determination of the ALJ that Uleski's mental impairments do not meet or equal the listing in § 12.05?

Essentially, Uleski contends that because she had: (a) two IQ scores that fall within the range set out in the listing, each obtained prior to reaching age 22, and also presented evidence of (b) another mental impairment (major depressive disorder and bipolar disorder) imposing additional and significant work-related limitations of function, she met the specific

---

[21] *Buxton v. Halter*, 246 F.3d 762, 772 (6th Cir. 2001) (citations omitted).

[22] *LeMaster v. Sec'y of Health & Human Servs.*, 802 F.2d 839, 840 (6th Cir. 1986); *Tucker v. Comm'r of Soc. Sec.*, No. 3:06cv403, 2008 WL 399573, at *6 (S.D. Ohio Feb. 12, 2008).

[23] *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007).

requirements of subsection C of listing 12.05.[24] She further argues that the ALJ also erred in finding that she does not have a significant deficit in adaptive functioning. Specifically, she asserts, the ALJ may not rely on earnings from past employment to show the absence of a deficit in adaptive functioning because she required "significant accommodation" to do the work, and her pay was then also subsidized.[25]

As the Sixth Circuit recently noted, because "satisfying the listing at the third step yields an automatic determination of disability based on medical findings, rather than judgment based on all relevant factors for an individual claimant, the evidentiary standards for a presumptive disability under the listings are more strenuous than for claims that proceed through the entire five step evaluation."[26]

With that in mind, Judge Gwin recently summarized the applicable standard for determining disability under listing § 12.05C as follows:

> To be rendered disabled under Listing 12.05C, an individual must (1) have a valid IQ score between 60 and 70; (2) suffer from another impairment causing a significant work-related limitation of function; and (3) fit the "diagnostic description"[FN53] – that is, he must exhibit "significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested ... before age 22."[FN54] With respect to the requirements of the diagnostic description, a claimant must satisfy three factors: "(1) subaverage intellectual functioning; (2) onset before age twenty-two; (3) and adaptive skills limitations."[FN55] "Adaptive skills

---

[24] ECF # 21 at 5-7.

[25] *Id.* at 8-10

[26] *Peterson v. Comm'r of Soc. Sec.*, No. 13-5841, __ F. App'x __, 2014 WL 223655, at *6 (6th Cir. Jan 21, 2014) (citation omitted).

limitations" refers to "a claimant's effectiveness in areas such as social skills, communications skills, and daily-living skills."[FN56]

FN53. *West v. Comm'r of Soc. Sec.,* 240 F. App'x 692, 697–98 (6th Cir. 2007). *See* 20 C.F.R. Pt. 404, Subpt. P, App'x 1 § 12.05; *Foster v. Halter,* 279 F.3d 348, 354-55.

FN54. 20 C.F.R. Pt. 404, Subpt. P, App'x 1 § 12.05. *See West,* 240 F. App'x at 697–98; *Foster,* 279 F.3d at 354-55.

FN55. *Hayes v. Comm'r of Soc. Sec.,* 357 F. App'x 672, 674–75 (6th Cir. 2009).

FN56. *Id.* at 677 (citing *Heller v. Doe,* 509 U.S. 312, 329, 113 S.Ct. 2637, 125 L.Ed.2d 257 (1993) (quoting Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders, 28–29 (3d rev.ed.1987)).[27]

Moreover, Judge O'Malley has developed the analytical standard as to the first prong – the diagnostic description – in greater depth:

> With respect to the requirements of the introductory paragraph, "a claimant must demonstrate three factors to satisfy the diagnostic description: (1) subaverage intellectual functioning; (2) onset before age twenty-two; (3) and adaptive skills limitations."[FN9] *Hayes,* 2009 WL 4906909 at *2. The requirements of the introductory paragraph track the definition of mental retardation in the *Diagnostic and Statistical Manual of Mental Disorders,* Fourth Edition ("DSM–IV"), and the Sixth Circuit references the DSM–IV when evaluating disability claims. *Burrell v. Comm'r of Soc. Sec.,* No. 99–4070, 2000 U.S.App. LEXIS 33161, at *4 (6th Cir. Dec. 8, 2000) (citing Brown, 948 F.2d at 270).
>
> FN9. "Adaptive skills limitations" refers to "a claimant's effectiveness in areas such as social skills, communications skills, and daily-living skills." *Hayes,* 2009 WL 4906909 at *5 (citing *Heller v. Doe,* 509 U.S. 312, 329, 113 S.Ct. 2637, 125 L.Ed.2d 257 (1993) (quoting Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders,* 28–29 (3d rev. ed.1987)).

---

[27] *Holt v. Comm'r of Soc. Sec.*, No. 1:12-CV-2369, 2013 WL 4748029, at *3 (N.D. Ohio Sept. 4, 2013).

If the claimant satisfies the diagnostic description of the introductory paragraph, then he must establish both components of sub-section (C): he must have (1) a valid IQ score below 71; and (2) "a physical or other mental impairment imposing an additional and significant work-related limitation of function." *See West v. Comm'r of Soc. Sec.*, 240 F. App'x 692, 697–98 (6th Cir. July 5, 2007) (unpublished).

As the regulation indicates, the two components of sub-section C address the *severity* of the impairment: the Social Security Act recognizes that many individuals with mild mental retardation are still able to work and, accordingly, a claimant who satisfies the diagnostic description must still produce a valid IQ score below 71 *and* demonstrate "a physical or other mental impairment imposing an additional and significant work-related limitation of function." 20 C.F.R., Pt. 404, Subpt. P, App. 1, § 12.05(C); *see also Muntzert v. Astrue*, 502 F.Supp.2d 1148, 1157–58 (D.Kan.2007) ("DSM–IV and Listing 12.05(C) assume many, if not most, mildly mentally retarded individuals will be able to work. However, they recognize that some mildly mentally retarded individuals may be unable to work where they have 'a physical or other mental impairment imposing an additional and significant work-related limitation of function.' 20 C.F.R., Pt. 404, Subpt. P, App. 1, § 12.05(C).").[28]

Of particular importance here, *Thomas* also emphasizes that there is "ample Sixth Circuit precedent for the proposition that ... a clinical psychologist's diagnosis of the claimant as outside the definition of 'mental retardation' is an important factor for the ALJ to consider in determining whether the claimant satisfies the introductory paragraph of Listing 12.05C."[29] *Thomas* explained further:

[S]ignificant reliance [by the ALJ] on a diagnosis of something other than 'mental retardation' such as 'borderline intellectual functioning,' is particularly sensible in light of the fact that the diagnostic description of mental retardation in the introductory paragraph of Listing 12.05 tracks the DSM-IV. Indeed, the

---

[28] *Thomas v. Comm'r of Soc. Sec.*, No. 08-CV-1365, 2010 WL 1254788, at *8 (N.D. Ohio March 25, 2010).

[29] *Id.*, at *11 (citations omitted).

-8-

> DSM-IV is 'one of the leading texts in medicine and, as noted above, it is used extensively by Sixth Circuit courts to evaluate disability claims.[30]

Thus, *Thomas* concluded, while a diagnosis of mental retardation is not a requirement imposed by the introductory paragraph of Listing 12.05C, an ALJ is entitled to give "substantial weight" to the diagnosis of borderline intellectual functioning, not mental retardation, despite the presence in the record of a full-scale IQ score of 70.[31]

Similarly, and also by Judge O'Malley, is the case of *Brooks v. Astrue*,[32] decided just the day before *Thomas*. *Brooks* found, *inter alia*, that a diagnosis of something less severe than mental retardation in a situation where the claimant has an IQ score below 71 is "relevant evidence" as to both (a) whether the diagnostic description was met, and (b) whether the IQ score was valid.[33]

Here, Uleski was largely classified by those who examined her as having borderline intellectual functioning, and not mental retardation.[34] Specifically, the school district that

---

[30] *Id.* (citations omitted).

[31] *Id.*, at *12.

[32] *Brooks v. Astrue*, No. 08-CV-2608, 2010 WL 1254323 (N.D. Ohio March 24, 2010).

[33] *Id.*, at *6 (citations omitted).

[34] Only Dr. Ronald Smith, a consulting examining psychologist, opined that Uleski had "mild mental retardation (estimated)." Tr. at 451. The ALJ ascribed only little weight to this opinion, since it was "simply not consistent with the totality of the evidence of record." *Id.* at 25. Uleski does not contest this weight assignment.

performed the pre-age-22 IQ testing[35] and Dr. Zeck, a consulting examining psychologist,[36] whose opinion was given great weight by the ALJ,[37] both found Uleski had borderline intellectual functioning and not mental retardation. Further, the state reviewing psychologist, Dr. Lewis, in an opinion to which the ALJ also assigned great weight, likewise found that Uleski had borderline intellectual functioning, noting that Uleski's school achievements were beyond the expected level and that she had a history of preforming well at her job for several years.[38]

Thus, as noted above, the multiple diagnoses of borderline intellectual functioning, not mental retardation,[39] in this case provides substantial evidence for the finding that Uleski did not meet or equal Listing 12.05, particularly the introductory paragraph of that listing.

Although that conclusion is enough to here affirm the decision of the Commissioner, I also observe that the fact that Uleski was assigned to special education classes is only circumstantial evidence of deficits in adaptive functioning, and not, of itself, sufficient to

---

[35] *Id.* at 273.

[36] *Id.* at 380.

[37] *Id.* at 25. Uleski does not challenge the weight assigned to Dr. Zeck's opinion.

[38] *Id.* at 378-81.

[39] I am aware that the term "mental retardation" has been replaced by the phrase "intellectual disability" in Listing 12.05. 78 Fed. Reg. 46, 499 (Aug. 1, 2013) (to be codified at 20 C.F.R. parts 404 and 416). However, since the present record uses the prior term, I do so as well in the interest of readability and consistency.

establish such deficits.[40] Nor is the fact that some element of her employment may have been subsidized proof of deficits in adaptive functioning or evidence that this employment cannot be used to show she had no deficits in adaptive functioning.[41] While these facts may have directed the ALJ toward a different conclusion when weighed differently in the consideration of the record as whole, the evidence cited above of multiple diagnoses of borderline intellectual functioning, not mental retardation, as well as no evidence of deficits in adaptive functioning prior to age 22, provides substantial evidence to support the finding that Uleski does not met or equal the Listing 12.05 diagnostic definition for mental retardation.

---

[40] *Peterson*, 2014 WL 223655, at *7 (history of attending special education classes is "circumstantial evidence" that was not enough to show adaptive functioning deficits before age 22).

[41] Uleski argues that because her job was subsidized and performed at a slower pace, that job cannot be evidence that she lacked adaptive functioning. ECF # 23 at 8-10. But, as the ALJ notes, notwithstanding those factors, Uleski worked consistently from the time she was 18 until the alleged onset date, stopping work only because she was laid off. Tr. at 20. The case cited by Uleski – *Yeager v. Comm'r of Soc. Sec.,* No. 2:08-cv-1078, 2010 WL 99062, at *5 (S.D. Ohio Jan. 5, 2010) – stands in part for the unremarkable proposition that "the fact that plaintiff may have been able to hold employment or obtain a driver's license does not absolutely preclude him from establishing disability under Listing 12.05."The fact that Uleski's prior employment "does not absolutely preclude" her from establishing disability is a long way from suggesting that such employment is not relevant evidence as to whether she had a deficit of adaptive functioning. Indeed, in *Thomas*, Judge O'Malley affirmed a finding that the claimant did not meet Listing 12.05 where the claimant's work record was poorer than Uleski's. Thomas was fired from his only job because he could not keep up with the pace of the box folding machine, yet the ALJ's decision that Thomas did not have significantly subaverage general intellectual functioning with deficits in adaptive functioning was affirmed largely, as here, because there were multiple diagnoses of borderline intellectual functioning, not mental retardation. *Thomas*, 2010 WL 1254788, at **12-13.

## Conclusion

Therefore, for the reasons stated, I find that substantial evidence supports the finding of the Commissioner that Uleski had no disability. The denial of Uleski's applications is affirmed.

IT IS SO ORDERED.

Dated: May 20, 2014          s/ William H. Baughman, Jr.
                                                   United States Magistrate Judge